Complaint is made by the plaintiff, and testimony was introduced to establish the fact, that the park is a refuge for the assembling of disorderly people on Sundays and in the evenings. If such be the fact, ample remedy is provided by the above section to punish all wrong duers by appealing to the criminal courts, which are open and free to all. If defendants are guilty of keeping a disorderly place, all those who participate in so doing are amenable to the criminal side of this court, and on conviction can be fined one hundred dollars, or imprisoned for six months, or both, at the discretion of the court.

Sec. 7033 Rev. Stats., provides that: "Whoever, being over fourteen years of age, engages in common labor on Sunday, (works of necessity and charity excepted,) shall, on complaint made within ten days thereafter, be fined not more than tive dollars, but this section does not extend to those who conscientiously observe the seventh day of the week as the Sabbath, nor shall it be construed so as to prevent families emigrating from traveling, watermen from landing their passengers, superintendents or keepers of toll bridges or toll gates from attending the same, or ferrymen from conveying travelers over waters."

It is impossible for the defendants to operate these amusements on the Sabbath day without violating the provisions of the above section, which is known as the "Common Labor Act."

The operation of the various amusements by the defendants is not a nuisance per se. We find that defendant corporation is legally authorized to establish and maintain a place of amusements at the park. It may become a nuisance, however, by being improperly managed and conducted, or by operating the amusements at unseasonable hours. The testimony shows that the corporation has invested $57,000.00 and that there is a mortgage on the premises of $3,500.00.

We find that the amusements are innocent, participated in chiefly by children, and that they are neither sinful nor hurtful; no intoxicating liquors of any kind are either sold or given at the park nor within one and one-half miles thereof; the place is under the surveillance of the police department of Dayton, which under tLe present management is of itself a guaranty of peace and good order.

The burden of proof is on the plaintiff to make out a case for a temporary restraining order as prayed for. Measuring the proof from a numerical stand-point, we find that it stands twelve to twenty-four against her. Measuring it according to the weight, we find that it largely preponderates in favor of the defendants. We believe Mrs. Fisher to be an honest, well meaning woman, who thoroughly believes that it is the duty of the civil courts to strictly enforce the divine injunction "Remember the Sababth day to keep it holy." We further believe that she is not acting altogether in her own interest, but in a measure for the benefit of the pub-

lic. We believe that the keeping open of the park on Sundays is a shock to her moral sensibilities, and such a departure from her ideas of right and wrong, that it has largely controlled her action in this matter. But we by no means intend to say or claim that she has not told the truth or tnat she has not suffered physical discomfort in the use and occupancy of her property at times. But it is fundamental that she cannot vindicate others' rights by process in her own name, nor employ civil process to punish wrongs to the public. As is well settled in the caes of Bloom v. Richards, 2 Oho St., p. 388, in the opinion delivered by Judge Thurman, under our form of government no code of morals or rule of religious conduct is recognized as a part of the organic law of the land. If we are not properly protected in the enjoyment of our personal and property rights under existing laws, appeal must be made to the legislative and not to the judicial branch of our government. It is the duty of the courts to administer the law as they find it, and not to make it.

An order may be taken in this case, restraining defendants from operating said amusements between the hours of 10 p. m. and 8 a. m., to remain in force until the further order of the court.

Van Skaik & McIlhenny, Young & Young and F. W. Howell, for Plaintiff.

Gunckel, Rowe & Shuey, McMahon & McMahon, and J. P. Spriggs, for Defendant.

---

(Clark County, O., Probate Court.)

M. L. KISSELL v. FREDERICK GRAM.

---

1.—It is the duty of the probate court to appoint a guardian for resident idiots, imbeciles or lunatics, upon a proper application and hearing therefor.

The fact that previous to such application and hearing, such idiot, imbecile or lunatic, has been admitted into an infirmary, and his property taken possession of by the officers of such institution, will not deprive the court of such duty.

---

Application for the appointment of a guardian.

ROCKEL, J.

In December, 1879, an inquest of lunacy upon Frederick Gram was held in this court. He was found to be a lunatic ana sent to the asylum at Dayton, Ohio. In February, 1884, he was removed as an incurable from the asylum to the infirmary of Clark county, Ohio, where he has remained ever since, and is yet a lunatic.

No pay has ever been received by the infirmary board for his maintenance. Frederick Gram was the owner of no property until his father, Cornelius Gram, died in December, 1890, when he fell heir to real estate of the value of about $1,200.00, and personalty of about $100.00. On August 6.

1891, this application was filed in this court by his brother-in-law, M. L. Kissell, for the appointment of a guardian, and was set for hearing on August 1, 1891. On August 11, 1891, the board of infirmary directors commenced suit in partition, claiming to represent the interest of Frederick Gram, under sec. 979 and 981 R. S., in the estate of his father, Cornelius Gram, deceased. They now resist this application for appointment of a guardian on the ground that under secs. 979 and 981, Rev. Stats., they are entitled to the care and custody of all the property of said F·ederick Gram, and that there is no use for a guardian, and that therefore this court cannot appoint a guardian. The infirmary directors claim possession of Gram's property under the following sections of the Rev. Stats. :

"Sec. 979. When a person is admitted into the infirmary as a pauper, whether insane or otherwise, and such person is possessed of or is the owner of property, whether real or personal, or has an interest in remainder, or is in any other manner entitled to gift or legacy, or bequest, of whatever nature or kind the same may be, the directors may take possession of all such property or other interest such pauper is entitled to, and as soon thereafter as they deem proper, sell or dispose of the same, the real estate to be sold as hereafter provided, and the net proceeds arising therefrom shall be applied, in whole or in part, under the special direction of the directors, in such manner as they think proper, during the continuance of such person as pauper in said infirmary, and the net proceeds arising from the sale of any property belonging to such pauper, shall be paid over to the county treasurer, and by him placed to the credit of such pauper to be paid out upon the warrant of the county auditor, approved by the county commissioners; and the clerk shall open an account with said pauper, and charge him with board and such specific sums as are furnished for his exclusive use, which account shall be approved by the board, and shall be submitted to the county commissioners on the first Monday of March, and September of each year, when the directors make their report."

"Sec 981—When a person is admitted into the infirmary as pauper, whether insane or otherwise, and such person is possessed of, or is the owner of real estate, or has an interest in reversion, or is in any manner legally entitled to gift, legacy, or bequest in real estate, the directors shall take possession of all such property or other interest such pauper is entitled to, and when they deem it advisable and to the best interest of such pauper, shall proceed to sell the same, and they shall file a petition for that purpose in the court of common pleas or probate court, in the county where such property is situated, and the proceedings therefor, sale, confirmation of sale and execution of deed by said directors, shall, in all respects, be conducted in conformity to the practice and statutory provisions for the sale of real estate by guardians, and the net proceeds aris-

ing from such sales, shall be applied under the special direction of the directors, in such manner as they think best, to the maintenance of such person during his continuance as a pauper in the infirmary."

"But if the guardian, husband, wife, heirs, or persons who are entitled to the residuary interest in said property, of said pauper, give bond to the directors of the infirmary, to their satisfaction, and pay into the hands of the clerk of the board of directors, at such times as the directors require, an amount sufficient to support said pauper while he remains in the infirmary, the directors shall not take charge of said property."

Do these statutory provisions confer such power and duties upon the infirmary directors, as will preclude the appointment of a guardian by the probate court in a case like the present one, presents a question of some difficulty. The power of chancery courts over the estates of infants, lunatics, etc., as exercised by the courts of England, has generally been transferred to the probate courts of this state. It was always claimed by the chancery courts of England, that they had a right to appoint a guardian for the property of a lunatic.

But this power is given also in Ohio by the provisions of the following statute :

"Sec. 6302.—The probate court, upon satisfactory proof that any person, resident of the county, or having a legal settlement in any township thereof, is an idiot, imbecile, or lunatic, shall appoint a guardian for such person, which guardian shall, by virtue of such appointment, be the guardian of the minor children of his ward, unless the court shall appoint some other person, as their guardian ; an imbecile shall in this chapter be understood to mean a person who, not born idiotic, had become so; provided that no such guardian be appointed until at least three days * * * notice to the persons next of kin, resident of the county of such person, is given to attend at the same time and place, which notice shall be served by delivering to each person named therein a copy thereof, or by leaving such copy at his usual place of residence."

The language of this section is positive : "Upon satisfactory proof that any resident of the county * * * is an idiot, imbecile or lunatic, the probate court shall appoint a guardian for such person."

Has the court a discretion in this matter, if the person is a lunatic and there is some responsible person willing to take the guardianship? The word "shall" implies the performance of some act. It is very rarely used in a request, and generally in a command.— Thou shalt not kill—thou shalt not commit adultery,—thou shalt not covet, etc., are familiar uses of this word. It is construed "must" in order to sustain an existing right, but need not be to create a new right. Cairo & Co. v. Hecht, 95 U. S., 170, "An appeal from the circuit court shall be allowed", in the U. S. Rev. Stat., 692, has been held to mean must be allowed when asked for by one in position to demand it

Hannibal etc. R. Co. v. Board of Equalization, 64 Mo., 304, where an act provides that certain lands shall be given to National Greene." It was held that these were words of absolute donation, and conveyed a present right. Rutherford v. Greene's Heirs, 2 Wheat., 198. "Shall not" has been construed to "mean cannot". Parke v. United States, 2 Wash., 363.

It would seem therefore, from the usually imperative meaning given to the word "shall", it would demand that where the court finds a person to be a lunatic, he must at least, unless positively forbidden by statute, appoint a guardian. Giauque in his work on Guardians and Trustees, in giving the law on this subject, uses the word "must" instead of "shall", p. 230.

A close examination of secs. 979 and 981 above herein quoted, will fail to disclose any positive prohibition of the exercise of the powers of the court to appoint a guardian of an insane pauper at the infirmary. If forbidden at all, it is only by implication. It is hardly to be presumed that by the provisions of these sections the legislature intended to make the infirmary board the guardian of every inmate in their charge. A lunatic is not there of his own free will; he is there by order of the court; he may have large property interests, he may have become insane in the midst of the perform ance of contracts affecting large interests of his own and others. Would it be said that the infirmary board may fullfil these contracts and carry on his business? Hardly.

But sec. 981, by its own provision where it says: "But if the guardian, husband, * * * etc., give bond, * * * the directors shall not take charge," strongly intimates that it is proper to appoint a guardian for the insane inmate    At least it is intimated that the * * * lunatic may have a guardian.

And there may be many other reasons which readily suggest themselves, and I need not stop to enumerate why he should have a guardian. And I rather take it to be the duty of the court if any competent person apply, or such guardianship, to make the appointment.

As to the rights between this guardian and the infirmary directors to the management of the ward's property, it is not necessary here to decide. Sufficient in this case that an order be made for the appointment of a guardian for Frederick Gram.

J. L. Zimmerman, for Application.

Chase Stewart, for Infirmary Board.